UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEBRA L. TUCKER, Individually and          )
as Personal Representative of the          )
ESTATE OF RICK G. TUCKER,                  )
                                           )
                Plaintiff,                 )
                                           )
                                           )
        v.                                 )   CASE NO. 1: 04-cv-1748-DFH-WTL
                                           )
SMITHKLINE BEECHAM                         )
CORPORATION, d/b/a                         )
GLAXOSMITHKLINE, a Pennsylvania            )
Corporation,                               )
                                           )
                                           )
                Defendant.                 )

ENTRY ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

    Plaintiff Debra L. Tucker has sued for the wrongful death of her brother,

Father Rick Tucker, the former parish priest of a Catholic church in Dunkirk,

Indiana.  Ms. Tucker alleges that her brother committed suicide as a result of

taking Paxil, an antidepressant medication manufactured and sold by defendant

SmithKline Beecham Corporation.


    At this stage of the case, there is no issue presented as to the merits of

plaintiff's claim.  Defendant has filed a motion to limit plaintiff's potential damages

to the reasonable medical, hospital, funeral, and burial expenses attributable to

her brother's death, and to exclude any recovery for loss of services and loss of

love, care, and affection.  Plaintiff has conceded that she is not entitled to recover punitive damages, so defendant's motion is granted with respect to Ms. Tucker's claim for punitive damages.  See *Durham v. U-Haul International*, 745 N.E.2d 755, 763 (Ind. 2001).

Under Indiana law, where an adult is wrongfully killed, damages for loss of services and loss of love, care, and affection may be awarded in most cases only to a surviving spouse and dependent children.  See Ind. Code § 34-23-1-1.  Where there is no surviving spouse or dependent child, however, a person who qualifies as a "dependent next of kin" may recover such damages.  *Id.*  Defendant contends that the undisputed facts show that Ms. Tucker is an independent and self-supporting adult who is not Father Tucker's dependent next of kin.

As explained below, genuine issues of material fact prevent the court from concluding, as a matter of law, that Ms. Tucker is not a dependent next of kin. Ms. Tucker is disabled from full-time work and has come forward with evidence that she needed, and Father Tucker provided, substantial financial assistance to her during his life.  Accordingly, defendant's motion is denied on this issue.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary

judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party must show that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented.  *Id.*  In deciding a motion for summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Celotex*, 477 U.S. at 323.

*Discussion*

I.    *Background*

Plaintiff Debra L. Tucker filed suit against defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK"), in state court.  GSK removed the action to this court, relying on diversity jurisdiction under 28 U.S.C. § 1332.  GSK is incorporated in Pennsylvania and maintains its principal place of business

there.  Ms. Tucker is proceeding individually and as the personal representative of the estate of her deceased brother, Father Rick Tucker.  In her individual capacity, Ms. Tucker is a resident and citizen of Indiana.  Father Tucker was a resident and citizen of Indiana at the time of his death.  Accordingly, Ms. Tucker also is deemed a citizen of Indiana in her capacity as personal representative of her brother's estate.  See 28 U.S.C. § 1332(c)(2).

Father Tucker committed suicide in September 2002 at the age of 55.  Ms. Tucker alleges that her brother took Paxil, a prescription medication manufactured and marketed by GSK, during the three weeks prior to his suicide. She claims that Father Tucker's suicide was caused by this medication.

Indiana's general wrongful death statute authorizes suits by a personal representative of the decedent for a death caused by the "wrongful act or omission of another." Ind. Code § 34-23-1-1.  Under the statute, claims for Father Tucker's medical, hospital, funeral, and burial expenses inure to his estate.  See *id.*  The parties agree that Ms. Tucker may seek these damages for his estate.

Under the statute, any remaining damages inure "to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased."  *Id.*  The purpose of the statute is to compensate a decedent's dependents for pecuniary loss.  Father Tucker was a

-4-

Catholic priest and worked for the Lafayette Diocese of the Catholic Church of North Central Indiana for 27 years up until the time of his death.  He was not survived by a widow, any children, or parents.  Father Tucker's only sibling was Ms. Tucker, his 50-year-old sister.  See Def. Ex. A.  The issue before the court is whether Ms. Tucker qualifies as Father Tucker's "dependent next of kin" within the meaning of Indiana's wrongful death statute.

II.    *Facts for Summary Judgment*

The following facts are relevant to Ms. Tucker's relationship with the decedent.  The facts are either undisputed or reflect the evidence in the light reasonably most favorable to Ms. Tucker as the party opposing summary judgment.

Ms. Tucker is a single 50-year-old woman who lives alone.  She suffers from rheumatoid arthritis, lupus with memory loss, hypertension, and diabetes.  Pl. Ex. 1.  In or around 1993, these conditions caused Ms. Tucker to quit her job as a pharmacist and to apply for disability benefits.  Tucker Dec. ¶ 7.  In 2002, she received approximately $570-$580 per month in government disability benefits.  Tucker Dep. at 69.  Ms. Tucker's only other source of income is her pay from working three days a week (4.5 hours per day) as the director of a soup kitchen.  She has held that job since retiring from full-time work in 1993.  In 2002 and at the time she filed this lawsuit, Ms. Tucker's part-time job at the soup kitchen paid

about $5000 to $6000 per year. *Id.* at 10-11, 47-48. Father Tucker's annual income at the time of his death was about $13,000. *Id.* at 35.

During his lifetime, Father Tucker contributed to his sister's life in a variety of economic and non-economic ways. In 1994, Father Tucker arranged for his sister to live rent-free in a home owned by a Catholic parish in Muncie, Indiana. Ms. Tucker lived in that home until the end of 2002. Tucker Dec. ¶ 8. After her brother's death, Ms. Tucker rented a condominium for $875 per month. Tucker Dep. at 47. She has recently arranged to move into less expensive housing.[1]

Father Tucker also made direct monetary contributions to his sister. Ms. Tucker estimated that her brother gave her about $300 to $400 per year toward her prescription medications and $500 to $900 per year toward her utility bills. Tucker Dep. at 53-54, 59-60. She testified that he especially helped out in the

---

[1]The court denies defendant's request to strike Ms. Tucker's affidavit testimony that Father Tucker arranged for her to live in the Muncie home because he was good friends with the parish priest. Defendant argues that this testimony is inconsistent with the following testimony from her deposition:

> Q:  How was it that you, that you happened to, to live in the house?
> A:  I had an apartment before. And when I took over as director for the kitchen, soup kitchen, the priest there had been talking about this house that was just sitting empty and I was looking for something bigger so that's, that's how it was offered. He said, you know, I could live there and just pay utilities.

Tucker Dep. at 46. Defendant has not shown that these two accounts are irreconcilable. The priest at the Muncie soup kitchen appears to be the same priest who was a friend of Father Tucker, whose friendship and influence may have persuaded the priest to offer the house to Ms. Tucker.

winter months when her utility bills were highest.  Ms. Tucker estimated that
Father Tucker spent about $20 to $50 per month on groceries for her.  *Id.* at 44.
When her disability payments were cut off for several months in 2002, her brother
helped pay her bills and whatever else she could not pay out of her salary.  *Id.* at
202.

Ms. Tucker testified that Father Tucker typically gave her money without
her having to ask for it, but she did ask him for help about two or three times per
year, mainly for utilities during the winter months.  Tucker Dep. at 58-59, 193.
Ms. Tucker admits that her brother's payments were not similar to an allowance
and that they were not on a regular schedule.  *Id.* at 55-56, 62.  But she described
his assistance as "steady income" and testified that "most months I got money
from him."  *Id.* at 216-17.  Father Tucker usually paid his sister by check, but Ms.
Tucker testified that he also gave her cash in varying amounts about eight to ten
times per year.  *Id.* at 56-57.  Patricia Boyd, a close friend of both Father Tucker
and Ms. Tucker, testified that she had seen Father Tucker pay for food and other
items for Ms. Tucker about 15 to 20 times, totaling between $75 and $100.  Boyd
Dec. ¶ 14.[2]

---

[2]Ms. Tucker has offered copies of her bank records from February 1999-
August 2002 as evidence of the exact dates and amounts of Father Tucker's
support. See Pl. Ex. 8.  Defendant has objected that the records are hearsay and
fail to satisfy the certification requirements of the business records exception to
the hearsay rule in Fed. R. Evid. 803(6).  The records in their current form would
be inadmissible at trial, and therefore the court does not consider them for
purposes of summary judgment.  See, *e.g.*, *Woods v. City of Chicago*, 234 F.3d
979, 988 (7th Cir. 2000) (generally, party seeking to offer business record at
(continued...)

Father Tucker also helped his sister by paying toward more major purchases. In 1992, Father Tucker gave Ms. Tucker the full $1400 purchase price of a used car. Tucker Dep. at 204. In June 2002, Father Tucker contributed $300 toward a vacation she took to Cape Cod that cost $800. *Id.* at 63-64.

Father Tucker provided some assistance in relation to his sister's medical problems. In the early 1990's, he encouraged her to travel to the Mayo Clinic in Minnesota and traveled with her. Boyd Aff. ¶ 15 (non-hearsay portions).[3] He drove her to the doctor about three to four times per year when she did not feel well enough to drive herself. He also would block out Ms. Tucker's doctor appointments from his schedule in case he was needed, but he was not on a regular schedule of assisting her with medical problems. Ms. Tucker testified that she currently drives herself to her appointments. Tucker Dep. at 51-52.

---

[2](...continued)
summary judgment stage must attach affidavit sworn by person who would be qualified to introduce the record as evidence at trial). As long as the records are authentic, however, it seems likely that the missing foundation could be supplied for trial.

[3]Defendant has asked the court to strike several paragraphs (Boyd Dec. ¶¶ 10-13, 15-16) from Ms. Boyd's affidavit as inadmissible hearsay. The majority of Ms. Boyd's statements appear to draw from her personal knowledge and first-hand exposure to the relationship between Ms. Tucker and Father Tucker, both of whom she has known since 1975. See Boyd Dec. ¶ 6. However, statements in Paragraphs 12 and 16 relating to Ms. Tucker or Father Tucker "confiding" in Ms. Boyd are inadmissible as hearsay, and her report in Paragraph 15 about Father Tucker paying expenses for a trip with Ms. Tucker to the Mayo Clinic also appears to be hearsay. The court does not consider these statements for purposes of the motion.

In the last six or seven years, Ms. Tucker has suffered more frequent lupus "flares." As a result, she has had to cut back her already part-time work schedule and is not paid for the days she is absent from work. Tucker Dep. at 41-42. Ms. Tucker testified that in 2002, her ailments caused her to miss "at least twenty" days of work, and her brother took care of her at home for about 10 to 15 of those episodes. *Id.* at 43. She testified that generally he would stay for about an hour or two and help with cooking, laundry, and other household chores. *Id.* at 44. She also estimated that Father Tucker took her to his rectory at least four times that year because she was too sick to stay by herself. *Id.* at 40-41. In the past, friends also helped Ms. Tucker by bringing food to her home, although "most of the time" she relied on her brother. *Id.* at 43. Since her brother's death, Ms. Tucker's friends have continued to bring her food, but she "pretty much" handles her flares herself. *Id.* at 49. Ms. Tucker was recently diagnosed with non-Hodgkin's lymphoma. *Id.* at 14.

Ms. Tucker also has presented evidence about her more routine contact with Father Tucker. Ms. Tucker testified that she spoke with her brother on the phone at least every day, and saw him "at least twice a week, sometimes three [times]." Tucker Dep. at 38. Ms. Tucker cooked dinner for her brother almost every Saturday night. *Id.* at 205. She testified that she is able to do her own grocery shopping, cooking, and cleaning, but that Father Tucker "did a lot of grocery shopping for me and things around the house." *Id.* at 39, 41.

Ms. Tucker claims that she has had a difficult time supporting herself financially since her brother's death.  She testified that she used approximately half of the $44,000 in proceeds from his life insurance policy to buy a new car because hers was old and failing.  She used the balance to pay rent, but has since been required to locate a cheaper place to live.  She has stopped taking some of her more expensive medications.  Tucker Dec. ¶ 9.  Ms. Tucker also testified that her brother's death caused her to suffer depression and more lupus flares, requiring her to miss work and attend therapy.  Tucker Dec. ¶ 10.

In general, Ms. Tucker characterizes her brother's role in her life as similar to that of a parent.  She points out that she was almost eight years younger than him, single, and without living parents or close relatives.  She testified that the two were "best friends."  She also testified that she could not have supported herself financially without his help when she went on disability payments and began working part-time at the soup kitchen for very modest wages.  Tucker Dep. at 188.  Ms. Tucker testified that she needed, depended on, and relied on the money that Father Tucker provided her.  *Id.* at 218.  She testified that she does not know how she will make ends meet without the money she received from him each month.  Tucker Dec. ¶ 9.

III.    *Analysis*

The Indiana Supreme Court has articulated a two-part test for dependency under Indiana's general wrongful death statute: "proof of dependency must show

a need or necessity for support on the part of the person alleged to be a dependent . . . coupled with the contribution to such support by the deceased." *New York Central R.R. Co. v. Johnson*, 127 N.E.2d 603, 607 (Ind. 1955), cited in *City of Indianapolis v. Taylor*, 707 N.E.2d 1047, 1060 (Ind. App. 1999).   Moreover, "dependency must be actual, amounting to a necessitous want on the part of the beneficiary and a recognition of that necessity on the part of the decedent, an actual dependence coupled with a reasonable expectation of support or with some reasonable claim to support from the decedent."   *Kirkpatrick v. Bowyer*, 169 N.E.2d 409, 412 (Ind. App. 1960), cited in *Taylor*, 707 N.E.2d at 1061.

Defendant GSK contends that Ms. Tucker cannot satisfy either part of this test.  GSK argues that Ms. Tucker is a financially self-sufficient adult and that her condition cannot be characterized as "necessitous want."  GSK also argues that Father Tucker's contributions to his sister were irregular and occasional acts of generosity, not the type of continuous support required for dependency under the statute.  See *Kirkpatrick*, 169 N.E.2d at 412 ("The mere fact that [the] deceased occasionally contributed to the support of the beneficiary in an irregular way, is not sufficient to support the action"); see also *Wolf v. Boren*, 685 N.E.2d 86 (Ind. App. 1997) (decedent's parents and adult siblings were not dependent next of kin by relying on decedent's financial support to maintain family vacation home).

Based on the evidence in the record, the court cannot conclude as a matter of law that Ms. Tucker's relationship with Father Tucker does not qualify her as

his dependent next of kin. The Indiana Supreme Court addressed "dependent next of kin" status most recently in *Estate of Sears v. Griffin*, 771 N.E.2d 1136 (Ind. 2002). In *Sears*, the court considered whether a 12-year-old girl qualified as the dependent next of kin of her deceased 18-year-old brother. The court acknowledged that it would be highly unusual for a sister who lived with both parents to have depended upon her teenage brother in this legal sense, but it reversed summary judgment for the defense and remanded for fact-finding on the issue. *Sears*, 771 N.E.2d at 1139.

The *Sears* court reaffirmed several general rules that are relevant here. First, a decedent need not have been *legally* obligated to support an individual for that person to qualify as a dependent next of kin. *Sears*, 771 N.E.2d at 1139, citing *Johnson*, 127 N.E.2d at 606-07. Second, total dependence is not required. *Id.*, citing *Johnson*, 127 N.E.2d at 607. A plaintiff "may be partially dependent even though he could survive without the contribution made by the deceased." *Deaconess Hospital, Inc. v. Gruber*, 791 N.E.2d 841, 846 (Ind. App. 2003), quoting *Lustick v. Hall*, 403 N.E.2d 1128, 1131-32 (Ind. App. 1980) (reversing judgment entered by court in favor of defendant where jury could have found that two minor children were partially dependent on their non-custodial parent); see also *Necessary v. Inter-State Towing*, 697 N.E.2d 73, 78 (Ind. App. 1998) (reversing summary judgment holding that adult son and grandson did not qualify as dependents of deceased mother when the three resided together and shared

household expenses; their relationship may have given rise to a "partial and mutual dependency").

Third, the *Sears* court recognized that pecuniary loss is the foundation of a wrongful death action, and that this loss can be determined in part by considering the assistance the decedent would have provided through money, services, or other material benefits. *Sears*, 771 N.E.2d at 1139, citing *Luider v. Skaggs*, 693 N.E.2d 593, 596-97 (Ind. App. 1998). However, the decedent's services or benefits must have gone beyond "merely helping" a family member, even if that person had relied on or become accustomed to such assistance. *Sears*, 771 N.E.2d at 1139; see also *Johnson*, 127 N.E.2d at 607 ("Payments for board, lodging or other accommodations, mere gifts, donations or acts of generosity . . . standing alone are not sufficient to establish dependency on the part of the recipient.").

Finally, the court in *Sears* noted that it had not found any cases recognizing dependency under the statute based on "purely emotional support." *Sears*, 771 N.E.2d at 1140; see also *Deaconess*, 791 N.E.2d at 847 (agreeing that services could be sufficient contributions to establish dependency, but that love, care, and affection were not). The *Sears* court acknowledged, however, that if dependent status were established, the statute would allow recovery for both loss of services and loss of love, care, and affection. *Id.* at 1138, citing Ind. Code § 34-23-1-1; see also *Robinson v. Wroblewski*, 704 N.E.2d 467, 475 (Ind. 1998) (recognizing that

pecuniary loss rule under Indiana's wrongful death statute had been expanded to allow recovery for loss of love and companionship by dependent next of kin); *Ed Wiersma Trucking Co. v. Pfaff*, 643 N.E.2d 909, 913 (Ind. App. 1994), *opinion adopted*, 678 N.E.2d 110 (Ind. 1997).

With these principles in mind, the evidence shows a genuine issue of material fact as to whether Ms. Tucker was a dependent of Father Tucker for purposes of Indiana's wrongful death statute. First, it is not at all clear that Ms. Tucker's reliance on her brother's assistance amounted to a mere expectation, as opposed to an actual need, of support. Ms. Tucker is a disabled adult. She is unmarried and had no other living relatives. She suffers from unpredictable medical problems that often require her to be absent from even part-time work. She has testified that she does not know how she will make ends meet without her brother's financial assistance. Under the law, Ms. Tucker could establish dependence and pecuniary loss without having been *totally* dependent on her brother. Certainly, her need for support was greater than that of adults in cases where Indiana courts have rejected dependency because the claimed dependent was both able-bodied and employed full-time. See, *e.g.*, *Deaconess*, 791 N.E.2d at 847 (business partner/adult daughter of decedent was not dependent where she and her husband were "able-bodied and self-sufficient" and reported adjusted gross incomes of over $100,000); *Estate of Miller v. City of Hammond*, 691 N.E.2d 1310, 1313 (Ind. App. 1998) (parents were not dependent on adult son who worked for family business where claimed dependents were both "able-bodied

individuals who maintain full-time employment"); *Koger v. Reid*, 417 N.E.2d 1142, 1145 (Ind. App. 1981) (affirming jury verdict that widowed father and two sons could not show pecuniary losses resulting from death of 17-year-old daughter where father was "an able-bodied man with an annual income of $26,000").

Moreover, Indiana courts have treated the effects of a decedent's death on an individual as relevant to the issue of dependency.  See *Luider*, 693 N.E.2d at 597 (reversing summary judgment for defendants on dependency issue where plaintiff alleged that he was "both emotionally and financially dependent on the decedent" and the undisputed evidence showed that he was forced to sell his home, demoted at work, and in therapy for depression following decedent's death). Ms. Tucker has presented evidence that following her brother's death she experienced depression and an increase in her lupus flares.  She also has presented evidence that she has stopped taking some of her more expensive medications and has relocated to cheaper housing because of financial difficulties. A jury is entitled to hear this evidence in determining whether her relationship with her brother prior to his death was one of dependence.

GSK points to a note by Ms. Tucker's physician in July 2002 as evidence that Ms. Tucker is independent and self-sufficient.  See Pl. Ex. 1.  According to the note, Ms. Tucker told her physician that she was considering moving to the East Coast.  While Ms. Tucker may have expressed this intention, it is undisputed that

she did not follow through with it.  The note will be available as evidence, but it is not conclusive by itself on the issue of dependence.

As for the second requirement for dependency, the evidence also could support a finding that Father Tucker contributed regular financial assistance and services to Ms. Tucker that went beyond mere acts of generosity.  Father Tucker contributed substantially to the cost of Ms. Tucker's utility bills and prescription medications.  He helped her secure housing and assisted in major purchases, including paying for her car.  Ms. Tucker testified that she received money from Father Tucker "most months."  He made arrangements to be available for all doctor appointments and drove her to some appointments.  He performed chores around the house when she was ill.  By providing these services, and especially by providing financial assistance, Father Tucker contributed to his sister in a "tangible and material way" that could form the basis of Ms. Tucker's pecuniary loss.  See *Lustick*, 403 N.E.2d at 1132; see also *Johnson*, 127 N.E.2d at 607 (holding that evidence sustained finding of dependency by married woman on adult daughter who sent money each week for household bills and other incidentals and helped pay toward more substantial costs like home down payment and mother's surgery); *Taylor*, 707 N.E.2d at 1061 (holding that evidence sustained finding of dependency by divorced mother of three on teenage son who helped around the house and made regular monetary contributions from his paper route).  The fact that Ms. Tucker did not ask Father Tucker for money more

than a few times each year may say less about her dependence on him than it says about his ability to recognize her need without being asked.

In addition, contrary to GSK's suggestion, Indiana courts do not appear to require that a benefactor's contributions have been continuous in the sense that they adhered to a regular schedule.  Instead, courts have required simply that the decedent's contributions have been more than occasional.  The evidence could support a finding that Father Tucker's assistance was more than occasional.  Further, Ms. Tucker's primary needs may not have adhered to a regular schedule.  Ms. Tucker requested financial help from her brother in the winter months because that is when her utility bills were highest.  She also relied on his flexibility and availability to help when she suffered from unpredictable lupus flares.  Again, under the decisions of the Indiana courts, plaintiff need not show that she was totally dependent on the decedent to demonstrate pecuniary loss.

The authority cited by GSK does not require a different outcome.  Ms. Tucker's case is distinguishable from *Chamberlain v. Parks*, where the court held that parents of a 25-year-old man did not qualify as dependent next of kin.  692 N.E.2d 1380 (Ind. App. 1998).  In that case, the parents conceded that their son provided no financial support.  The court concluded that the day-to-day household tasks he had performed were no more than "acts of generosity expected of a son to whom free housing, most of his board, gasoline money and automobile insurance was provided."  692 N.E.2d at 1384.  By contrast, Father Tucker

provided significant financial assistance to his sister.  In addition, the evidence does not suggest that the two shared a *quid pro quo* arrangement similar to the family in *Chamberlain*.  Ms. Tucker's case is also distinguishable from *Kirkpatrick*. There, the court held that five adult children, each married and four with families of their own, did not have a need for support and therefore were not legally dependent upon their mother who had assisted in household tasks and bestowed gifts on her grandchildren.  169 N.E.2d at 413.  The evidence in this case could support a finding that Father Tucker's assistance was more regular and more tangible than that provided in *Kirkpatrick*.  Finally, Ms. Tucker's case also is distinguishable from *Miller*, where the court held that parents were not dependent next of kin of their adult son.  In addition to the parents' lack of need, the son's contributions to his family were indirect by working for the family business. 691 N.E.2d at 1313.

GSK argues that if Ms. Tucker is recognized as a dependent next of kin of Father Tucker, courts will be flooded with wrongful death claims from every friend or family member who has been diagnosed with a serious but not life-threatening illness.  This argument fails to account for the specific circumstances of Ms. Tucker's own situation.  Ms. Tucker has presented evidence of several financial contributions by Father Tucker, both in the form of one-time sums and as accumulated over time.  She also has presented evidence that her brother was a daily presence in her life and that she lacked any other support network.  Based on the evidence before the court, and the evident pattern of Indiana court

decisions leaving such issues for the practical wisdom and common sense of juries, the court cannot conclude as a matter of law that Ms. Tucker was not the dependent next of kin of Father Tucker.

*Conclusion*

Accordingly, defendant's motion for partial summary judgment (Docket No. 30) is denied in part and granted in part.  The motion is denied on the issue of whether Ms. Tucker qualifies as Father Tucker's "dependent next of kin" under Indiana's wrongful death statute.  A jury must make this determination.  The motion is granted with respect to Ms. Tucker's claim for punitive damages.  This case remains set for trial on Monday, October 16, 2006.

So ordered.

Date: March 21, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Andrew T. Bayman
KING & SPALDING LLP
abayman@kslaw.com

L. Frank Coan, Jr.
KING & SPALDING LLP
fcoan@kslaw.com

Bonnie L. Gallivan
ICE MILLER LLP
gallivan@icemiller.com

David F. Norden
KING & SPALDING LLP
dnorden@kslaw.com

Frances M. Phares
BAUM HEDLUND
fphares@baumhedlundlaw.com

Dylan A. Vigh
DULIK & VIGH
dvighlaw@gmail.com

Katherine A. Winchester
ICE MILLER LLP
winchest@icemiller.com