UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEBRA L. TUCKER, individually and as personal representative of the ESTATE OF RICK G. TUCKER, <br><br> Plaintiff, <br><br> v. <br><br> SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, a Pennsylvania corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. 1:04-cv-1748-DFH-WTL

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Debra L. Tucker has sued for the wrongful death of her brother,
Father Rick Tucker, the former parish priest of a Roman Catholic church in
Dunkirk, Indiana. Ms. Tucker alleges that her brother committed suicide as a
result of taking Paxil, an antidepressant medication manufactured and sold by
defendant SmithKline Beecham Corporation ("GSK"). She contends that GSK
breached a duty to warn of a danger of increased suicide risk from taking Paxil.

The court previously denied summary judgment to GSK on the issue of Ms.
Tucker's right to recover as Father Tucker's dependent next of kin, but granted
summary judgment to GSK on any claim for punitive damages. *Tucker v.
SmithKline Beecham Corp.*, 2006 WL 753128 (S.D. Ind. March 21, 2006). GSK has

now moved for summary judgment on the ground that Ms. Tucker's state law claims are preempted by federal law. Because the federal Food and Drug Administration ("FDA") requires GSK to include language in Paxil's labeling that conflicts directly with the warning that Tucker argues was required under Indiana law, Tucker's state law claims based on GSK's alleged failure to warn are preempted.[1]

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The decisive issue here is preemption, a question of law that can be resolved on summary judgment.

---

[1]GSK has also moved for summary judgment on the issues of causation and breach of duty. Docket No. 84. Because Tucker's state law claims are preempted by federal law, the court does not reach GSK's alternate grounds for summary judgment or GSK's motion *in limine* to exclude the expert testimony of Dr. David Healy and Dr. Joseph Glenmullen, Docket No. 82.

*Undisputed Facts*

I.   *Father Tucker*

Father Rick Tucker was the parish priest of a Roman Catholic church in Dunkirk, Indiana.  Beginning in 1985, Father Tucker began intermittently taking a number of different antidepressants and anti-anxiety medications after experiencing insomnia, fatigue, stress, anxiety, and addiction to smoking.  In the early 1990s, Father Tucker's problems were compounded when his sister informed him that as a child, she had been sexually abused by a lay teacher within the Catholic church.  To the dismay of Father Tucker, the diocese had apparently dismissed her claims as "frivolous."  Father Tucker was also dealing with a number of physical problems by the late 1990s to early 2000, including hypertension, hyperlipidemia, non-insulin dependent diabetes, and cardiovascular issues.

In July 2002, Father Tucker sought counseling from Dr. Thomas Murray, a psychologist.  Father Tucker reported being anxious about the possible results of an upcoming audit by the Diocese because he was concerned that it would discover certain "irregularities" from his practice of advancing himself his salary and then repaying it at later dates.  Murray Dep. at 34, 46.  He also remained "angry and irritated at the diocese for not following through with that he thought they should have done" regarding his sister's claims of abuse.  *Id.* at 34.

In August 2002, Father Tucker's personal treating physician, Dr. Thomas Bright, prescribed Paxil after Father Tucker reported that feelings of panic interfered with his ability to perform his duties with the church.  Bright Dep. at 62.  Father Tucker told Dr. Bright that he was receiving counseling and working on the underlying issues, but that he also wanted a prescription.  *Id.*  Plaintiff alleges that Father Tucker began taking Paxil in August 2002 and took the drug for about three weeks.  Compl. ¶ 19.  Father Tucker committed suicide in September 2002 at the age of 55.  Debra Tucker alleges that her brother's death was caused by his use of Paxil during the three weeks prior to his suicide.

II.     *Early History of Paxil, Other SSRIs, and Suicidality*

Paxil (also known as paroxetine hydrochloride) is one of several prescription anti-depressants classified as selective serotonin re-uptake inhibitors ("SSRIs").  SSRIs operate by adjusting the manner in which the neurotransmitter serotonin is processed by brain cells.  SSRIs are used to treat depression, along with other conditions.  Following a three-year review period for Paxil, the FDA first approved the drug for the treatment of adult depression in 1992; since then, the agency has formally reviewed and approved at least twelve new adult indications or formulations of the drug.

The relationship between SSRIs and suicidality has been both long-running and controversial.  Even before Paxil was approved for use by the FDA, concerns existed in the scientific literature that at least one other SSRI might actually cause

patients to develop thoughts of suicide.  A series of six Harvard case studies published in the American Journal of Psychiatry in February 1990 found that intense, violent, suicidal thoughts appeared to be associated with the use of fluoxetine, a drug that operates in a manner similar to Paxil.  See Martin H. Teicher, et al., *Emergence of Intense Suicidal Preoccupation During Fluoxetine Treatment*, 147 Am. J. Psychiatry 207-10 (1990).  In light of concerns over the drug, the FDA convened a meeting of its Psychopharmacological Drugs Advisory Committee ("PDAC") in 1991 to evaluate the connection between fluoxetine and suicide.[2]  The PDAC and the FDA agreed that no credible evidence existed at the time that fluoxetine caused the "emergence and/or intensification of suicidality and/or other violent behaviors."  Docket No. 80, Ex. F. at 294. The FDA subsequently denied two citizen petitions seeking withdrawal of FDA-approval for fluoxetine, Docket No. 80, Ex. G, or alternatively, a requirement that the drug include a warning about an increased risk of suicide, Docket No. 80, Ex. H.

When the FDA considered whether to approve GSK's New Drug Application for Paxil around this time, there is some indication that the agency likewise evaluated whether this particular SSRI posed a risk of increased suicidal thinking and behavior.  In June 1991, the lead FDA safety reviewer for Paxil reported that after reviewing submitted data for the drug, "there is no signal in this large database that paroxetine exposes a subset of depressed patients to additional risk

---

[2]The PDAC is described by GSK as an independent panel of psychiatrists, psychopharmacologists, epidemiologists, and experts in other scientific disciplines drawn from outside the FDA.  See Docket No. 80 at 11-13.

for suicide, suicide attempts or suicidal ideation." Arning Aff. Ex. 3.  Another FDA

official, Dr. Thomas Laughren, reported:

> Ever since the concern was raised about fluoxetine being associated with suicidality, we have always looked at the other serotonin reuptake blockers with regard to the question of the possible emergence of suicidal thinking and behavior.  This was the search strategy with paroxetine. . . .

> The bottom line here is that none of [the investigations] suggested any greater risk of suicidality for paroxetine than for the other comparator groups and, in fact, paroxetine actually beat the other groups on a number of these variables.  So there was no suggestion here of emergence of suicidality with paroxetine.

Arning Aff. Ex. 4 at 29-30.  The PDAC unanimously concluded that Paxil was safe

and effective and recommended approval.  *Id.* at 153-54.  The FDA approved Paxil,

without requiring any warning associating the drug with suicidality.  Arning Aff.

Ex. 5 at 1.


III.   *Paxil and Suicidality in Children*

Plaintiff has offered evidence that by 2003, indications existed that Paxil

increased the risk of suicidality in pediatric patients.  That year, officials in the

United Kingdom reviewing Paxil's suitability for use in children required GSK to

offer a contraindication with the drug.  An expert working group for the United

Kingdom concluded:

> Data on the safety and efficacy of paroxetine in MDD in children and adolescents under the age of 18 did not demonstrate efficacy in depressive illness in this age group, and showed an increase in the risk of harmful outcomes, including episodes of self-harm and potentially suicidal behavior in the paroxetine group compared to placebo.

Docket No. 103, Ex. 57 at 60.

In 2004, the FDA examined the relationship of Paxil and suicidality in pediatric patients. The agency convened the PDAC to study a meta-analysis of 24 short-term, placebo-controlled trials involving more than 4400 patients. Docket No. 149, Ex. D at 2. According to the FDA, this data "represented the first systematic demonstration of a causal link" between the use of antidepressants and suicidality in pediatric patients. *Id.* As a result of the investigation, the FDA asked GSK and other manufacturers of antidepressants to add a "black box" warning to the drug labels.

IV.    *Re-examination of Paxil and Suicidality in Adults*

In April 2006, GSK completed its own analysis of suicidality as it related to patients of all ages using Paxil. GSK found its analysis "showed a higher frequency of suicidal behavior in young adults (prospectively defined as aged 18-24 years) treated with paroxetine compared with placebo, although this difference was not statistically significant. In the older age groups (aged 25-64 years and = 65 years), no such increase was observed." Docket No. 150, Ex. 1 at 9. GSK's 2006 report went on to note that: "In adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behaviour in patients treated with paroxetine compared with placebo. However, the majority of these attempts for paroxetine (8 of 11) were in younger adults aged 18-30 years." *Id.*

Between May 2006 and August 2007, GSK revised Paxil's labeling to include the following:

> In adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behavior in patients treated with paroxetine compared with placebo (11/3,455 [0.32%] versus 1/1,978 [0.05%]); all of the events were suicide attempts. However, the majority of these attempts for paroxetine (8 of 11) were in younger adults aged 18-30 years. These MDD data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24.

Docket No. 150, Ex. 2 at 12.

Following the controversy surrounding SSRI antidepressants and suicidality in children, the FDA also engaged in its own evaluation of whether antidepressants were associated with increased risk of suicidality in adults. The FDA announced that it was performing a "complete review of all available data" to determine whether such a link existed. See Docket No. 80, Ex. 33. The PDAC convened to review the agency's meta-analysis of suicidality data derived from placebo-controlled trials of antidepressants in adult patients with major depressive disorder and other psychiatric disorders. In sum, the PDAC evaluated a pooled analysis of 295 short-term trials covering more than 77,000 patients and eleven different antidepressants. Docket No. 149, Ex. B at 2.

Based on recommendations from the PDAC, the FDA contacted GSK in May 2007 and informed the company that it must now include the following revised warning with Paxil:

Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short-term studies of major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of [Paxil] or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 or older. Depression and certain other psychiatric disorders are themselves associated with increases in the risk of suicide. Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior.

Docket No. 149, Ex. C (Letter from Thomas Laughren, M.D., Director of the FDA's Division of Psychiatry Products, to Barbara Arning, M.D., Senior Director of GSK U.S. Regulatory Affairs). The FDA's revised warning confirms a risk of suicidality in pediatric patients but affirmatively rejects any such association in adults.

*Discussion*

GSK argues that it cannot be held liable for the alleged inadequacy of Paxil's labeling because the Supremacy Clause of the United States Constitution mandates that the federal Food, Drug, and Cosmetic Act (FDCA) and federal labeling requirements preempt Tucker's state law claims.

I. *Conflict Preemption Generally*

The United States Constitution and federal laws and treaties "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." U.S. Const. Art. VI, Cl. 2.   In applying this foundation of American federalism, the Supreme Court has recognized three types of  federal preemption of state law.   First is express preemption, where Congress states explicitly the preemptive effect of its legislation on state law.   See *English v. General Electric Co.*, 496 U.S. 72, 78-79 (1990).  Second is field preemption, where Congress intends for federal law to occupy exclusively an entire field for regulation.  *Id.* at 79.  Third is the type of preemption advocated by GSK in this case, conflict preemption.  Conflict preemption arises when it is either "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002) (internal quotations and citations omitted).   The "purpose of Congress is the ultimate touchstone" in any preemption analysis.  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 542 (1992), quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978).

The Supreme Court has also made clear that conflict preemption can arise even when the conflict does not stem directly from federal statutory language. Regulations promulgated pursuant to federal statutory authority "have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  A federal agency "acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986).

Because states are themselves independent sovereigns within the federal system, there is a general presumption "that Congress does not cavalierly pre-empt state-law causes of action."  See *C.E.R. 1988, Inc. v. Aetna Casualty and Surety Co.*, 386 F.3d 263, 269 (3d Cir. 2004), quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (express preemption case); see also *Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."), quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  Thus conflict preemption applies only if the need for it is clear. *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000) ("a court should not find pre-emption too readily in the absence of clear evidence of a conflict"), quoted in *Zikis v. Pfizer, Inc.*, 2005 WL 1126909, at *2 (N.D. Ill. May 9, 2005) (denying motion for summary judgment based on federal preemption in similar case involving Zoloft).

This presumption against preemption is particularly robust in the present case, where GSK argues for preemption of an area that has long been left to the states – the regulation of public health and safety.  See *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 275 (E.D.N.Y. 2007); see also *Lynnbrook Farms v. SmithKline Beecham Corp.*, 79 F.3d 620, 627 (7th Cir. 1996) (finding that in the area of public health and safety, the presumption "can be overcome by an agency's clear declaration of intent to preempt state law"), citing *Hillsborough County v.*

*Automated Medical Lab., Inc.*, 471 U.S. 707, 715-16 (1985).  Adding further weight to the presumption against preemption is the fact that parties have long had the ability to recover against pharmaceutical manufacturers based on a failure to warn.

GSK argues for preemption that would effectively leave injured parties without a means of compensation.  GSK must base this position on a particularly clear showing of conflict.  See *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) ("The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption"); *Medtronic*, 518 U.S. at 487 ("It is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct'"), quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984).

II.   *FDA Regulation of Drug Labeling*

The federal government's efforts to regulate the pharmaceutical industry can be traced back to 1906, when Congress passed the Pure Food and Drug Act ("PFDA"), Pub. L. No. 59-384, 34 Stat. 768 (repealed 1938).  From the very outset, it was clear Congress was concerned about properly informing the public about the nature of the product being sold.  The PFDA banned the manufacture and distribution of adulterated and misbranded food and drugs.  It also banned false and misleading labeling and required complete disclosure of a drug's ingredients. See  Charles  J.  Walsh  &  Alissa  Pyrich,  *FDA  Efforts  to  Control  the  Flow  of*

*Information at Pharmaceutical Industry-Sponsored Medical Education Programs*:
*A Regulatory Overdose*, 24 Seton Hall L. Rev. 1325, 1335 (1994).  In 1938,
Congress increased its regulatory efforts by enacting the Food, Drug, and
Cosmetics Act ("FDCA").

Today the FDA is responsible for enforcing the FDCA.  Congress has broadly
charged the FDA with promoting "the public health by promptly and efficiently
reviewing clinical research and taking appropriate action on the marketing of
regulated products," 21 U.S.C. § 393(b)(1), and with ensuring that "drugs are safe
and effective."  21 U.S.C. § 393(b)(2)(B).  As part of its regulatory mission, the FDA
undertakes an extensive review of new drugs before they are allowed on the
market.  See 21 U.S.C. § 355 (outlining the new drug application, or "NDA,"
process).

Most prescription drugs, including Paxil, begin the regulatory approval
process as a "new drug."  21 U.S.C. § 321(p).  The FDA will approve an NDA only
if it is satisfied that the drug's labeling accurately describes its indications,
dosages, administration, contraindications, warnings and precausations, adverse
reactions, interactions, and use in specific populations.  21 C.F.R. §§ 201.56(d),
201.57. As part of the approval process, manufacturers of new drugs submit to
the FDA "specimens of the labeling proposed to be used for such drug."  21 U.S.C.
§ 355(b)(1); see also 21 C.F.R. § 314.50(c)(2)(i).  While there are several mandatory
aspects of included drug information, the aspect relevant to the present case

involves the "warnings" section.  The warning section of the information included with prescription drugs "must describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug)."  21 C.F.R. § 201.57(c)(6)(i).  Under the FDA's regulations, warnings must be included on a label "as soon as there is reasonable evidence of a causal association [of a serious hazard] with a drug."  *Id.*

Most important for present purposes, the FDCA envisions a number of remedies against violators.  These include *in rem* forfeiture, injunction, and/or criminal prosecution against the manufacturer or responsible person if a "misbranded" drug is distributed.  21 U.S.C. §§ 332(a) (granting jurisdiction to district courts to hear requests for injunctions against violations of § 331), 333 (providing criminal penalties for violations of § 331), 334(a), and 337(a).  The FDA may also seek to withdraw approval of the New Drug Application.  21 C.F.R. § 314.150(b).  A drug is "misbranded" under federal law if any particular is labeled in a false or misleading way.   21 U.S.C. § 352(a).

Once the FDA has approved a new drug for use, the regulations envision a continuing role for the agency in evaluating the safety of that drug.  The FDA can move to withdraw its approval of a drug if it finds that "scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved."  21 U.S.C. § 355(e).  The FDA considers both

information it received at the time of the application and new information that may come to light.  *Id.*  FDA regulations also allow manufacturers to make certain changes to their drug labels.

There are two ways a manufacturer can make these changes.  The first is to submit a Prior Approval Supplement, which, as its name implies, requires FDA approval before the requested change can be made.  21 C.F.R. § 314.70(b).  The second is to use a Changes Being Effected ("CBE") supplement.  21 C.F.R. § 314.70(c)(6)(iii).  For changes made using a CBE supplement, a manufacturer does not need prior FDA approval to make the change.  Instead, the manufacturer can unilaterally make the change while also submitting the change for review by the FDA.  Among the changes that can be made using the CBE supplement are changes to "add or strengthen a contraindication, warning, precaution, or adverse reaction."  21 C.F.R. § 314.70(c)(6)(iii)(A).

III.    *Conflict Between Federal Requirements and Plaintiff's State Law Claims*

Tucker claims that GSK should be held liable under Indiana law for failing to include an adequate warning that Paxil can cause suicidality in adult patients. GSK denies that any such causal relationship exists and argues that any warning about such an effect would conflict directly with the FDA's findings and labeling requirements for the drug.

Several courts have considered whether drug manufacturers can be held liable under state law for failing to include warnings that were not required by the FDA.  Most have concluded that such claims are not preempted by the FDA labeling approval process.  See *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 274 (collecting cases).  In January 2006, the FDA expressed its opinion that federal labeling requirements should preempt state law claims based on allegedly inadequate warnings because the federal requirements "establish both a 'floor' and a 'ceiling.'"  Requirements on Content and Format of Labeling, 71 Fed. Reg. at 3934-35.

Even after the January 2006 statement from the FDA, see 71 Fed. Reg. 3922, district courts considering the issue have generally continued to allow such claims to proceed.  See *Sarli v. Mylan Bertek Pharmaceuticals, Inc.*, 2007 WL 2111577 (M.D.N.C. July 19, 2007); *In re Vioxx Prods. Liab. Litig.*, — F. Supp. 2d —, 2007 WL 1952964 (E.D. La. July 3, 2007); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. June 11, 2007); *McNellis v. Pfizer, Inc.*, 2006 WL 2819046 (D.N.J. Sept. 29, 2006); *Barnhill v. Teva Pharmaceuticals USA, Inc.*, 2007 U.S. Dist. LEXIS 44718 (S.D. Ala. April 24, 2007); but see *Sykes v. Glaxo-SmithKline*, 484 F. Supp. 2d 289 (E.D. Pa. 2007); *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 530 (E.D. Pa. 2006) (affording deference to the FDA's position that warnings associating paroxetine with suicidality would have been deemed false and misleading by the agency).

In the view of most courts declining to find preemption, drug manufacturers were required to include warnings affirmatively mandated by the FDA, but no conflict existed because these manufacturers were still free under applicable regulations to add or strengthen warnings without prior FDA approval. In contrast to the FDA's position in the January 2006 Preamble, courts have generally maintained that the agency's labeling requirements represent only a minimum standard.

There is a delicate balance here. SSRIs are safe and effective for many patients who suffer from serious illnesses. These patients include many whose underlying conditions may make them vulnerable to suicide, especially if no effective treatment is available. The FDA (and courts) must take seriously the possibility that warnings that are too dire, whether imposed by a federal regulatory mandate or as a result of jury verdicts in cases like this one, could discourage the use of the drugs by patients who need them. As the FDA has said in this context: "Exaggeration of risk could discourage appropriate use of a beneficial drug." Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3922, 3935 (Jan. 24, 2006). At the same time, where there are known, significant risks of dangerous side effects, patients and physicians must be informed about them so that they may act accordingly. The FDA has now taken definitive action to balance these competing interests. The FDA has done so in a way that is flatly inconsistent with plaintiff Tucker's theory of the case.

Similar to most of the cases in which courts have declined to find preemption, FDA-mandated labeling for Paxil had long been silent as to whether Paxil could cause suicidality among adult patients.  For many years the FDA required GSK to include several warnings related to Paxil, none directly addressing the issue of drug-induced suicidality.[3]  At most, the FDA required GSK to warn physicians generally:  "The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs."  Docket No. 80, Ex. 5 at 5.  In 2004, the FDA called on GSK to included a warning associating Paxil with suicidality in pediatric patients, but still remained silent on the issue of adult patients.  Given such labeling requirements, GSK could have voluntarily included, and in fact eventually did include in May 2006, a stronger warning stating that the drug caused suicidality among adult patients, if GSK had believed the data supported such a warning.

In light of recent developments, however, the idea that GSK could or should supplement Paxil's labeling with a warning about adult suicidality is no longer tenable.  After widespread concerns that antidepressants caused an increased risk of suicidality in pediatric patients, the FDA re-examined the entire issue of antidepressants and suicidality in 2005.  Docket No. 149, Ex. A.  In May 2007, the

---

[3]In approving Paxil's NDA, the FDA called on GSK to include warnings and precautions that Paxil could, for example, negatively interact with monoamine oxidase inhibitors, as well as have some association with mania/hypomania, seizures, and hyponatremia.  Docket No. 80, Ex. 5 at 9-10.

FDA issued a revised warning label for Paxil that directly addresses the issue of suicidality as it relates to the drug.  The revised, mandatory label states:

> Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short-term studies of major depressive disorder (MDD) and other psychiatric disorders.  Anyone considering the use of [Paxil] or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need.  *Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24*; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 or older.

Docket No. 149, Ex. C (Letter from Thomas Laughren, M.D., Director of the FDA's Division of Psychiatry Products, to Barbara Arning, M.D., Senior Director of GSK U.S. Regulatory Affairs) (emphasis added).

The FDA's revised warning confirms the risk of suicidality in pediatric patients, but affirmatively rejects the hypothesis that there is any such association in adults.[4]  This recent FDA-mandated labeling stands in clear and undeniable conflict with Tucker's state law causes of action.  See *Geier*, 529 U.S. at 885 (applying preemption analysis to state law standards for conduct implicit in jury awards of damages for defective products).  Tucker's case is premised on her claim that GSK should have included a warning that Paxil can cause suicidality in adults.  To allow Tucker's claim to continue in light of such

------

[4]In this sense, the ceiling/floor analysis of FDA labeling requirements essentially drops out.  Even if the May 2007 revised labeling is interpreted as only a floor and not a ceiling, the language would still conflict with the warning that plaintiff claims should have been on the drug.

mandatory labeling requirements would invite an odd result.  State law would require GSK to warn that Paxil causes suicidality in adults, while federal law now expressly requires it to disavow any such association.

To avoid preemption, Tucker raises three arguments.  She first points out that the FDA's August 2007 labeling language applies to all SSRIs, not just Paxil in particular.  In arriving at the August 2007 warning language, the FDA relied on analysis of pooled data from several different SSRIs.  The agency then issued a common warning to all manufacturers of SSRIs.  Tucker's argument presumes that Paxil has unique pharmacological properties that make it more likely to cause suicidality than the typical SSRI.  In issuing a class-wide mandatory label that applies to Paxil, however, the FDA has made clear that it disagrees with Tucker's presumption.  By its actions, the agency has deemed that all drugs within this particular class pose a risk profile similar enough to warrant a uniform label on the issue of suicidality.

Tucker also claims that even a warning about the language contained in the FDA's August 2007 warning would have been adequate to prevent Father Tucker's suicide if GSK had included it earlier.  Plaintiff points specifically to the FDA's requirement:  "Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior."  Docket No. 149, Ex. C.  Tucker's argument, however, is undermined by the fact that Paxil has always carried

language that warned physicians to closely observe patients like Father Tucker. Paxil's earlier labeling stated: "The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy." Docket No. 80, Ex. 5 at 5. Tucker has not shown how the language currently required by the FDA would have been heeded any differently than the similar language that actually accompanied the drug when Father Tucker was taking it.

The FDCA amply authorizes the FDA to require drug manufacturers to place certain mandatory warnings on their products. More broadly, it is within the agency's authority to promote and protect "the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner." 21 U.S.C. § 393(b)(1). Here, the FDA convened an independent panel of outside experts (the PDAC) to study the association between suicidality and antidepressants, a topic of great concern within the medical community. The committee's conclusion that short-term studies did not show an increased risk was based on a "comprehensive review" of available data, Docket No. 149, Ex. A, essentially the same epidemiological data relied on by both sides in this case. Based on recommendations from this independent panel, the FDA concluded that it was in the interest of the public to dispel the hypothesis that antidepressants like Paxil increase the chances of suicidality in adult patients. *Id.* ("product labeling needed to reflect the apparent

beneficial effect of antidepressants in older adults").[5]  The FDA chose to do this by affirmatively requiring GSK to include language to that effect in its labeling for Paxil.  Because Ms. Tucker's state law claims seeking to impose liability on GSK represent an obstacle to the FDA's efforts to ensure the proper use of Paxil, these claims are preempted.  See, *e.g.*, *Geier*, 529 U.S. at 881 (imposing a duty under state tort law is a form of state action subject to preemption).

*Conclusion*

Because Debra Tucker's state law claims stand in direct conflict with the FDA's labeling requirements for Paxil issued pursuant to federal law, GSK's motion for summary judgment on the basis of federal preemption (Docket No. 76) is GRANTED.  All other pending motions are denied as moot.  Final judgment shall be entered in favor of defendant.

So ordered.

Date: September 19, 2007

*David F. Hamilton*

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

---

[5]Tucker has offered expert testimony from Dr. David Healy and Dr. Joseph Glenmullen that questions the FDA's conclusion that there is no association between Paxil and suicidality in adults.  Whatever the merits of Dr. Healy's and Dr. Glenmullen's opinions, there remains a direct conflict between the agency's properly issued requirements for Paxil's labeling and the warning that Tucker advocates.

Copies to:

Andrew T. Bayman
KING & SPALDING LLP
abayman@kslaw.com

Robert M. Brava-Partain
BAUM HEDLUND ARISTIE GOLDMAN & MENZIES
rbrava-partain@baumhedlundlaw.com

Mark S. Brown
KING & SPALDING LLP
mbrown@kslaw.com

L. Frank Coan Jr.
KING & SPALDING LLP
fcoan@kslaw.com

Todd P. Davis
KING & SPALDING LLP
tdavis@kslaw.com

Bonnie L. Gallivan
ICE MILLER LLP
gallivan@icemiller.com

Robert E. Glanville
PHILLIPS LYTLE LLP
rglanville@phillipslytle.com

Ronald L.M. Goldman
BAUM HEDLUND, A PROFESSIONAL CORP.
rgoldman@baumhedlundlaw.com

Tamar P. Halpern
PHILLIPS LYTLE LLP
thalpern@plllp.com

Karen Barth Menzies
BAUM HEDLUND
kbmenzies@baumhedlundlaw.com

George W. Murgatroyd III
BAUM HEDLUND PC
gmurgatroyd@baumhedlundlaw.com

David F. Norden
KING & SPALDING LLP
dnorden@kslaw.com

Frances M. Phares
BAUM HEDLUND
fphares@baumhedlundlaw.com

Chilton Davis Varner
KING & SPALDING LLP
cvarner@kslaw.com

Dylan A. Vigh
DULIK & VIGH
dvighlaw@gmail.com

Katherine A. Winchester
ICE MILLER LLP
winchest@icemiller.com